**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

LAYNE CHRISTENSEN COMPANY,
and DR. ARUP SENGUPTA,

          Plaintiffs,                    CIVIL ACTION

v.                                  No. 09-2381-JWL-GLR

THE PUROLITE COMPANY,

          Defendant.

## MEMORANDUM AND ORDER

In this action for patent infringement and breach of contract, Plaintiffs allege that Defendant, as a former licensee, infringed upon a patent for removal of arsenic from drinking water and breached the post-termination provisions of their license agreement. Currently pending before the Court is Plaintiffs' Motion to Disqualify Counsel (ECF No. 115). Plaintiffs request that the Court enter an order to disqualify attorney Robert C. Sullivan, Jr. and his current law firm, Fish & Richardson, from representing Defendant in this action. As set forth below, the motion is denied.[1]

## I.    Facts

The Court makes the following findings of fact:

In the Spring of 2003, Drs. Arup SenGupta, ("SenGupta") and Luis Cumbal invented certain technology used to selectively remove contaminants, such as arsenic, from water or other fluids (the "SenGupta Technology"). The SenGupta Technology is the subject of United States Letters Patent

---

[1]A magistrate judge's lawful authority to rule on a disqualification motion falls within the "pretrial duties" or "additional duties" delegated to magistrate judges under the Federal Magistrates Act. *See* 28 U.S.C. § 636(b)(1)(A); *Affeldt v. Carr*, 628 F. Supp. 1097, 1100-01 (N.D. Ohio 1985), *aff'd*, 827 F.2d 769 (6th Cir. 1987).

No. 7,291,578 (the "'578 patent"), the patent at issue in this action.

On November 25, 2003, SenGupta and SolmeteX, Inc. ("SolmeteX") entered into a license agreement (hereafter the "SenGupta-SolmeteX License Agreement"), which licensed the SenGupta Technology to SolmeteX. It granted SolmeteX an exclusive worldwide license, including the right to grant sublicenses, practice all methods and processes claimed or disclosed in the '578 patent, make, use, import, sell, and to otherwise use and exploit the SenGupta Technology.[2] Section 4.1.2 of the SenGupta-SolmeteX License Agreement provided that SolmeteX was responsible for filing, prosecuting and maintaining all licensed patents:

> Except as set forth in Section 4.1.1, [SolmeteX] shall be responsible for determining the patent prosecution strategy for the Licensed Inventions and for filing, prosecuting and maintaining all Licensed Patents at Licensee's expense. [SenGupta] shall cooperate with [SolmeteX] in regard thereto and shall take all actions requested by [SolmeteX] in connection therewith. In addition, [SenGupta] will supply any additional information relating to the inventions described in the Licensed Patents that [SolmeteX] may reasonably request from time to time.[3]

In 2004, SenGupta hired the law firm of Howson & Howson to file U.S. Patent Application No. 10/925,600, which claimed priority to U.S. Provisional Application No. 60/538,131, and which ultimately became the '578 patent.

Applying the SenGupta Technology to resin beads manufactured by Defendant The Purolite Company ("Purolite"), SolmeteX commercialized a product that can be used to remove arsenic from water. On September 29, 2004, SolmeteX and Purolite entered into an agreement entitled "Exclusive Manufacturing, Supply and Distribution Agreement" (the "SolmeteX-Purolite

---

[2]SenGupta-SolmeteX License Agreement (ECF No. 14-3), § 2.1.

[3]*Id.*, § 4.1.2.

Agreement").[4]  Under this agreement, SolmeteX appointed Purolite as its exclusive manufacturer and supplier.  It also granted Purolite a sublicense of SolmeteX's intellectual property to the extent necessary to manufacture, supply, and distribute the product.  Section 4.6 of the agreement set out each party's rights and responsibilities with regard to patent prosecution:

> SolmeteX is currently in the process of applying for a United States patent related to the [product] on behalf of [SenGupta], to which SolmeteX has exclusive worldwide rights.  Purolite will be responsible during the Term, at its own cost, for worldwide patent filings in those countries they deem appropriate following the issuance of US patent(s). Purolite will keep SolmeteX informed of the progress of such patent applications, and will allow SolmeteX the ability to review and comment on all correspondence and official documentation relating thereto. Purolite will promptly inform SolmeteX of any decisions it may make not to pursue certain patents or related applications (which shall be limited to those made in good faith business judgment). SolmeteX will have the right to pursue any such patents and related applications in its sole name and at its expense, and Purolite agrees to provide reasonable assistance requested by SolmeteX in that process.[5]

On or about January 13, 2005, the law firm of Howson & Howson filed an international patent application, pursuant to the Patent Cooperation Treaty entitled "Method of Manufacture and Use of Hybrid Anion Exchanger for Selective Remove of Contaminating Ligands from Fluids," using the subject matter disclosed in the '578 patent.[6]  The application listed SenGupta and Cumbal as the applicants and was signed by George A. Smith, Jr. of Howson & Howson, as attorney for applicants.[7]  The application claims priority of the earlier filed U.S. patent application for the same SenGupta Technology which became the '578 patent.

In the summer of 2006 Purolite retained Robert C. Sullivan, Jr. ("Sullivan"), who was then

---

[4]SolmeteX-Purolite Agreement (ECF No. 14-4).

[5]*Id.*, § 4.6.

[6]Ex. A to Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF No. 116-1).

[7]*Id.*

a member of the Darby & Darby law firm, "to engage foreign patent lawyers to prosecute several national phase entries of the [Patent Cooperation Treaty] application."[8]  Plaintiffs contend that Purolite hired Sullivan "to prosecute on SenGupta's behalf (as applicant and inventor) several national phase entries of the [Patent Cooperation Treaty] application for the SenGupta Technology."[9]  In letters dated July 11, 2006, Marie Collazo, Director of Patent Services of the Darby & Darby firm, directed  local counsel in Germany and in Japan to "initiate national phase procedures" in those countries for the January 13, 2005 international patent application.[10]  The letters specifically identified SenGupta as the applicant of the European national phase application and copied Sullivan and Stefan Brodie, of Purolite International, Ltd., on the correspondence.

On July 31, 2006, Marie Collazo of Darby & Darby sent a letter to Stefan Brodie of Purolite International, Ltd., regarding the European patent application.[11]  The letter noted that the Patent Cooperation Treaty was published with the International Search Report, and requested that Mr. Brodie provide a copy when the Report was made available.

On August 2, 2006, Flynn Barrison, Assistant Patent Services Manager at Darby & Darby, sent a letter to Stefan Brodie about the Japanese patent application.[12]  It enclosed correspondence, confirming that the Japanese national phase of the application was filed with the Japanese Patent Office.  The letter also advised of the deadline for, and costs associated with, requesting examination

---

[8]Def.'s Opp. to Pls.' Mot. to Disqualify (ECF No. 118), at 5.

[9]Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF No. 116), at 4.

[10]Exs. B and C to Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF Nos. 116-2 and 116-3).

[11]Ex. E to Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF No. 116-5) at 2.

[12]Ex. F to Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF No. 116-6) at 1-2.

of the application. Sullivan was copied on the correspondence.

On August 30, 2006, Marie Collazo of Darby & Darby sent to Stefan Brodie a letter, enclosing a copy of the official filing receipt for the Hong Kong application.[13] Sullivan was copied on the letter.

On November 15, 2006, Flynn Barrison sent another letter to Stefan Brodie regarding the European patent application.[14] The letter inquired whether an amendment should be prepared to amend the specification and claims. Flynn Barrison sent another letter to Stefan Brodie on December 20, 2006, enclosing a copy of the official Notification from the European Patent Office.[15] The letter also quoted the cost of filing a request to record registration of a patent application in Hong Kong, based upon a published European patent application. Sullivan was copied on all the correspondence.

On January 18, 2007, Flynn Barrison, informed foreign local counsel that "[o]ur client is interested in obtaining coverage in Hong Kong" and directed local counsel to register SenGupta's international patent application for the SenGupta Technology in Hong Kong.[16] Sullivan and Stefan Brodie were copied on this correspondence, regarding SenGupta's Hong Kong national phase entry.

On or about November 30, 2007, in connection with an Agreement of Sale between SolmeteX and Plaintiff Layne Christensen Company ("Layne"), Layne acquired SolmeteX's assets, including SolmeteX's rights in the November 25, 2003 SenGupta-SolmeteX Agreement.

---

[13]Ex. G to Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF No. 116-7).

[14]Ex. F to Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF No. 116-6) at 4.

[15]*Id.* at 5-6.

[16]Ex. D to Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF No. 116-4).

In December 2008 SenGupta emailed Gary Thundercliff of Purolite about revoking SenGupta's agreement with SolmeteX and entering into an agreement with Purolite. In an email dated January 6, 2009, Gary Thundercliff told SenGupta that he would have Sullivan of Darby & Darby call to "hear your situation."[17] According to Sullivan, the topic of his conversation in January 2009 with SenGupta was SenGupta's belief that SolmeteX had stolen from him certain intellectual property and his desire to end his relationship with SolmeteX and to enter into an agreement with Purolite (to the exclusion of SolemeteX).[18] Sullivan states that at the onset of the call, he inquired whether SenGupta had his own counsel who would participate in the call.[19] SenGupta told Sullivan that he was not represented by any lawyer.[20] Sullivan then advised SenGupta that neither he nor Darby & Darby represented him and that they represented only Purolite.[21]

On July 15, 2009, Sullivan transferred Darby & Darby's files of "Purolite International, Ltd. For [SenGupta]" to attorney Richard Johnson of Husch Blackwell Sanders.[22] The letter identified the files as the Hong Kong, European, and Japanese patent applications for "Method of Manufacture and Use of Hybrid Anion Exchanger for Selective Removal of Contaminating Ligands From Fluids." The letter states:

> Further to your e-mail of July 1, 2009 on behalf of your client, Layne Christensen, we are hereby transferring the above-identified files to you. Accordingly, our firm

---

[17]Ex. A to Pls.' Opp. to Purolite's Mot. for Protective Order (ECF No. 102-1).

[18]Sullivan Decl. (ECF No. 119) ¶ 12.

[19]*Id.*

[20]*Id.*

[21]*Id.*

[22]Ex. I to Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF No. 116-9).

has terminated its representation with respect to these three patent applications. . . . We have also informed the associates in foreign countries that we are no longer responsible for prosecution and maintenance, and that further correspondence should be directed to your firm.[23]

Mr. Johnson acknowledged receipt of the files on August 3, 2009.[24]

On July 21, 2009, Layne, having acquired SolmeteX, filed this action, asserting claims for patent infringement and breach of contract against Purolite. It alleges that Purolite, a former licensee, infringed upon the '578 patent by its refusal to stop making and selling the arsenic removal product after termination of the SolmeteX-Purolite Agreement. It also alleges that Purolite breached the post-termination provisions of the agreement.

On August 28, 2009, local counsel for Purolite filed a motion for Sullivan to appear *pro hac vice.*[25] The Court granted the unopposed motion on September 14, 2009.[26]

On September 17, 2009, Purolite filed a motion to transfer the case and to dismiss it for failure to join a party. It argued that SenGupta, as the owner and licensor of the '578 patent, was a necessary party to the action. The Court granted the motion to join a necessary party,[27] and SenGupta was added as a plaintiff on December 18, 2009.[28]

On March 24, 2010, Purolite's local counsel filed a Notice of Change of Firm and Address

---

[23]*Id.*

[24]*Id.* at 2.

[25]Mot. for Leave to Appear Pro Hac Vice (ECF No. 10).

[26]Order granting motion to appear pro hac vice (ECF No. 12).

[27]Dec. 4, 2009 Mem. & Order (ECF No. 21).

[28]Am. Compl. (ECF No. 22).

for Sullivan. It stated that he was no longer affiliated with the law firm Darby & Darby.[29] The Notice further indicates that he recently joined the law firm of Fish & Richardson and would continue as counsel for Purolite.

On September 15, 2010, Purolite filed its Second Amended Answer, in which it asserted a counterclaim, attacking the validity of the '578 patent.[30] On September 29, 2010, Plaintiffs filed the instant motion to disqualify Sullivan and his current law firm, Fish & Richardson, from representing Purolite.

## II. Summary of the Legal Arguments of the Parties

Plaintiffs ask the Court to disqualify Sullivan and his current law firm, Fish & Richardson, from representing Purolite, based upon his alleged prior representation of SenGupta, who is now a co-plaintiff in this action. They contend that in 2006, before Purolite was adverse to SenGupta, Purolite hired Sullivan and his law firm to prosecute foreign patent applications on behalf of SenGupta, as the applicant, for the same technology as claimed in the '578 patent at issue in this case. Plaintiffs thus claim that Sullivan, through his work on the foreign counterpart patent applications, previously represented SenGupta. They argue that, in the course of that representation, he has therefore been privy to privileged information about the '578 patent, which is at issue in this case. In addition to his alleged prior representation of SenGupta in 2006, Plaintiffs state that in January 2009 SenGupta and Sullivan engaged in at least one conversation about SenGupta's situation with Layne and Purolite.

Purolite opposes the motion on several grounds. It argues that Plaintiffs have failed to show

---

[29]Notice of Change of Firm and Address (ECF No. 29).

[30]Def.'s Second Am. Answer to Am. Compl., ¶¶ 46-47 (ECF No. 111).

that Sullivan had an attorney-client relationship with SenGupta or that his firm's prosecution of the foreign counterpart patents is substantially related or materially adverse to this litigation. It further argues that Plaintiffs have failed to show any appearance of impropriety in this case and suggests that their motion is only for strategic reasons. It also argues that the motion should be denied, because Plaintiffs unjustifiably and unduly delayed its filing for thirteen months after Sullivan was admitted *pro hac vice*.

## III.    Legal Standards for Ruling on a Motion to Disqualify Counsel

The control of attorneys' conduct in litigation is within the supervisory powers of the district court and, therefore, is a matter of judicial discretion.[31]   Motions to disqualify are governed by two sources of authority.[32]   First, attorneys are bound by the local rules of the court in which they appear. Federal district courts usually adopt the Rules of Professional Conduct of the states where they are situated.[33]   Second, because motions to disqualify counsel in federal proceedings are substantive motions that affect the rights of the parties, they are decided by applying standards developed under federal law.[34]   Therefore, motions to disqualify are governed by the ethical rules announced by the national profession and considered in light of the public interest and the litigants' rights.[35]

The Kansas Rules of Professional Conduct ("KRPC") have been adopted by this Court as

---

[31]*Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1383 (10th Cir. 1994).

[32]*Id.*

[33]*Id.*

[34]*Id.*

[35]*Id.*

the "applicable standards of professional conduct."[36]  The Court has the power to disqualify counsel at its discretion for violations of these professional standards of ethics.[37]  Ethical violations, however, do not automatically trigger disqualification.[38]  Disqualification is appropriate only where the offending attorney's conduct threatens to "taint the underlying trial" with a serious ethical violation.[39]  Because disqualification affects more than merely the attorney in question, the Court must satisfy itself that this blunt remedy serves the purposes behind the ethical rule in question.[40]  To disqualify counsel, the court must find the conflict of interest already existent or probable to occur.[41]  The moving party bears the initial burden of going forward with evidence sufficient to establish a *prima facie* case that a conflict exists; however, the ultimate burden of proof lies with the attorney or firm whose disqualification is sought.[42]

A motion to disqualify must be decided on its own facts, and the court must carefully balance the interest in protecting the integrity of the judicial process against the right of a party to have the

---

[36]D. Kan. Rule 83.6.1(a).

[37]*E.E.O.C. v. Orson H. Gygi Co., Inc.*, 749 F.2d 620, 621 (10th Cir. 1984); *Biocore Med. Techs., Inc. v. Khosrowshahi*, 181 F.R.D. 660, 664 (D. Kan. 1998).  *See also Hutchinson v. Pfeil*, 105 F.3d 562, 565 (10th Cir. 1997) (holding that disqualification is a nondispositive matter that may be ordered by a magistrate judge).

[38]*Biocore Med. Techs.,* 181 F.R.D. at 664; *Chapman Eng'rs, Inc. v. Natural Gas Sales Co., Inc.*, 766 F. Supp. 949, 954 (D. Kan. 1991).

[39]*Chapman Eng'rs,* 766 F. Supp. at 954 (citing *W.T. Grant Co. v. Haines*, 531 F.2d 671 (2d Cir. 1976)).

[40]*Biocore Med. Techs.,* 181 F.R.D. at 664 (citing *Koch v. Koch Indus.*, 798 F. Supp. 1525, 1530 (D. Kan. 1992)).

[41]*U.S. v. Trujillo*, 302 F. Supp. 2d 1239, 1255 (D. Kan. 2004).

[42]*Regent Ins. Co. v. Ins. Co. of N. Am.,* 804 F. Supp. 1387, 1390 (D. Kan. 1992); *Williams v. KOPCO, Inc.*, Civ. A. No. 94-1541-FGT, 1996 WL 137840, at *3 (D. Kan. Mar. 8, 1996).

counsel of its choice.[43]  In deciding a motion to disqualify counsel, the trial court must balance several competing considerations.  They include the privacy of the attorney-client relationship, the prerogative of a party to choose counsel, and the hardships that disqualification imposes upon the parties and the entire judicial process.[44]

The court reviews such a motion mindful that it can be used as a part of the litigation strategy or as a technique for harassing the other side.[45]  The court generally defers the issues of ethics to the appropriate disciplinary machinery, except in those cases where the challenged conduct threatens to taint the process.[46]  The court decides the motion on the facts peculiar to each case in an effort to balance carefully the interest of protecting the integrity of the process against the right of a party to the counsel of its choice.[47]  A motion to disqualify counsel deserves serious, conscientious, and conservative treatment.[48]

The Court recognizes that in some instances an evidentiary hearing is required before the court may enter an order to disqualify counsel.[49]  However, an evidentiary hearing is not required when the parties have fully briefed the issue and when there are no disputed issues of material facts

---

[43]*Kelling v. Bridgestone/Firestone, Inc.*, Civ. A. No. 93-1319-FGT, 1994 WL 723958, at *10 (D. Kan. Oct. 17, 1994).

[44]*Nat'l Bank of Andover, N.A. v. Aero Standard Tooling, Inc*., 30 Kan. App. 2d 784, 791, 49 P.3d 547, 533 (2002).

[45]*Koch*, 798 F. Supp. at 1530.

[46]*Id.*

[47]*Id.*

[48]*Id.*

[49]*See, e.g., Fullmer v. Harper*, 517 F.2d 20, 21 (10th Cir. 1975).

or there is otherwise no need for any additional evidence to be presented to the court.[50]  This matter

has been fully briefed by both sides, neither side has requested a hearing, and the material facts that

relate to disqualification are not in dispute.  Having reviewed the pleadings and evidence submitted

by the parties, the Court does not find it necessary to conduct an evidentiary hearing before ruling

on the instant motion to disqualify counsel.

## IV.  Whether Purolite's Counsel Should Be Disqualified Based upon an Alleged Conflict of Interest with SenGupta

Plaintiffs contend that Sullivan's representation of Purolite in this matter, after he and his

firm previously prosecuted foreign patent applications on behalf of SenGupta, violates Kansas Rule

of Professional Conduct 1.9(a).  That Rule provides that:

> A lawyer who has formerly represented a client in a matter shall not thereafter
> represent another person in the same or a substantially related matter in which that
> person's interests are materially adverse to the interests of the former client unless
> the former client gives informed consent, confirmed in writing.

Under KRPC 1.9, a party seeking to disqualify opposing counsel must establish that "(1) an

actual attorney-client relationship existed between the moving party and the opposing counsel; (2)

the present litigation involves a matter that is 'substantially related' to the subject of the movant's

prior representation; and (3) the interests of the opposing counsel's present client are materially

adverse to the movant."[51]  If the movant establishes the first two prongs, an irrebuttable presumption

arises that the client has revealed facts to the attorney that require the attorney's disqualification.[52]

---

[50]*Weeks v. Indep. Sch. Dist. No. I-89 of Okla. County*, 230 F.3d 1201, 1212 (10th Cir. 2000).

[51]*Cole*, 43 F.3d at 1383 (citing ABA Model Rule 1.9(a) & (c)).

[52]*United States v. Stiger*, 413 F.3d 1185, 1196 (10th Cir. 2005).

### A. Whether an Attorney-client Relationship Existed Between SenGupta and Sullivan

The party seeking to disqualify opposing counsel must first demonstrate that an attorney-client relationship existed between the party and the challenged counsel.[53] An attorney-client relationship need not have a formal contract.[54] Nor is the existence of a relationship dependent upon the payment of legal fees.[55] Instead, an attorney-client relationship can be established where the party shows that (1) it submitted confidential information to a lawyer and (2) it did so with the reasonable belief that the lawyer was acting as the party's attorney.[56]

The Court finds none of the traditional indicia of an attorney-client relationship between SenGupta and Sullivan in this case. Purolite has filed the Declaration of Sullivan in support of its position that no attorney-client relationship existed between Sullivan and SenGupta. Sullivan thereby states that he has never had any conversations with SenGupta concerning the '578 patent, or any foreign counterparts.[57] Aside from discovery in this action, he has never received any documents from SenGupta or SolmeteX concerning the '578 patent or any foreign counterparts of the '578 patent.[58] With regard to the work his former law firm Darby & Darby performed on the foreign counterparts, Sullivan states that all instructions that the firm received came from Purolite,

---

[53] *Cole,* 43 F.3d at 1383.

[54] *Id.* at 1384.

[55] *Id.*

[56] *Id.*

[57] Sullivan Decl. ¶¶ 5-6.

[58] Sullivan Decl. ¶¶ 7-8.

and all legal fees incurred in connection with the foreign counterpart patent applications were paid by Purolite.[59]  In Darby & Darby's record keeping system, Purolite was identified as the "client" for all of the foreign counterpart patent applications.  Darby & Darby reported any progress concerning the foreign counterparts to Purolite only.[60]

Plaintiffs have provided no information from SenGupta himself that would contradict or refute any of Sullivan's declarations.  SenGupta has made no assertion that he submitted confidential information to Sullivan or that he believed that Sullivan ever represented him.  The Court finds the silence of SenGupta, himself a co-plaintiff in this case, significant.  He has made no comment, either by way of affidavit, declaration, or testimony.  Without any supporting facts from SenGupta himself, Plaintiffs argue that he subjectively believed that Sullivan or Darby & Darby represented him or his interests when it pursued the foreign patent applications at Purolite's behest.  But they have made no showing that SenGupta retained Sullivan or Darby & Darby, obtained legal advice or services from them, communicated with them during the foreign application process, paid them, or otherwise had reason to believe that they were representing him.  SenGupta had previously retained another law firm, Howson & Howson, to prosecute his U.S. and international applications, filed in 2004 and 2005.

Nor do Plaintiffs offer any evidence to refute the declaration by Sullivan that his and Darby & Darby's client was Purolite, not SenGupta.  The correspondence about its work on the foreign counterpart patent applications supports the contention that Purolite was the client of Sullivan and Darby & Darby, not SenGupta.  Aside its communications with foreign lawyers, Darby & Darby

---

[59]Sullivan Decl. ¶ 9.

[60]Sullivan Decl. ¶ 10.

addressed all its correspondence to Stefan Brodie of Purolite International, Ltd. It addressed none of it to SenGupta. Nor did they send him copies. Contrary to what Plaintiffs suggest, the Court construes the reference to "our client" in Flynn Barrison's letter of January 18, 2007 to local counsel in Germany as a reference to Purolite, not SenGupta. The evidence before the Court indicates that Purolite retained Sullivan and Darby & Darby and sought and paid for their legal services in pursuing the foreign counterpart patent applications to the '578 patent. Plaintiffs have provided no written contract or retainer agreement to indicate that these lawyers also represented SenGupta. Nor does the Court find any evidence of an informal relationship, whereby Sullivan or Darby & Darby performed legal services gratuitously for SenGupta. Under the traditional indicia of an attorney-client relationship, Plaintiffs have failed to show that such relationship existed between SenGupta and Sullivan or either of his firms.

### B. Whether an Attorney-client Relationship Should be Implied When Sullivan and His Former Law Firm Prosecuted the Foreign Patent Applications on SenGupta's Behalf

Plaintiffs argue that an attorney-client relationship arose between Sullivan and SenGupta, when he and his former law firm prosecuted the foreign patent applications on his behalf as owner of the '578 patent. Plaintiffs argue that Purolite, as a licensee of the SenGupta Technology, had no independent right to his inventions or to prosecute the patent applications, which are equitably owned by SenGupta. They point out that SenGupta was listed as the applicant on each of the patent applications that Sullivan prosecuted in Europe, Hong Kong, and Japan. Although Purolite paid Sullivan to prosecute the applications, they argue SenGupta was his client for the purpose of obtaining the foreign patents.

Purolite denies that the work performed by Darby & Darby was on behalf of SenGupta. It

asserts instead that the work was on its own behalf, pursuant to its rights under the SometeX-Purolite Agreement to control the prosecution of foreign counterpart patents. It argues that SenGupta does not arise to the status of a client simply by virtue of his being the named applicant in the foreign patent applications. The Court must determine, therefore, whether Sullivan and his firm, by engaging foreign patent lawyers to prosecute the European, Japanese, and Hong Kong counterpart patents, as directed by Purolite under its sublicensing agreement with SolmeteX, created an implied attorney-client relationship with SenGupta, due to his status as owner and being designated as "applicant" on the foreign patent applications.

In intellectual property cases, the inquiry whether an attorney-client relationship exists can become complicated.[61] This is particularly true, if the patented technology has been licensed or sublicensed. Patent licensing agreements often give the licensee certain rights to the patented technology, including the right to independently pursue other patent applications and filings. The licensor or inventor often has an obligation under the licensing agreement to cooperate and assist the licensee in obtaining these other patents. Exercising its rights under the licensing agreement, the licensee retains the services of patent counsel to obtain further patents. This can include filing patent applications in countries other than the United States. As part of this process for filing foreign patent applications, counsel for the licensee may need to communicate with and obtain technical information from the inventor. In addition, the inventor may be listed as the "applicant"

---

[61]*See generally* Julia S. Ferguson, Charles F. Haisch, & Alan H. MacPherson, *Conflicts in Intellectual Property Law: a Brief Survey*, Practising Law Institute, Patents, Copyrights, Trademarks, and Literary Property Course Handbook Series, 616 PLI/Pat 539, 553, 565 (Sept. 2000); Tarek N. Fahmi, *Who's Your Client? Issues Involved in Representing Inventors and Their Assignees in Patent Matters,* Practising Law Institute, Patents, Copyrights, Trademarks, and Literary Property Course Handbook Series, 860 PLI/Pat 531 (Mar.-May 2006).

on the applications.

Thus the question arises: Does the work of counsel for the licensee in prosecuting foreign patent applications, including receipt of information from the inventor and identifying him by name as applicant, and resulting in a benefit to him, create an implied attorney-client relationship with the inventor? To answer this question, the Court considers a number of factors: (1) whether licensee and inventor were jointly prosecuting the patent applications,[62] (2) the nature of licensee counsel's communication and interactions with the inventor (were the communications solely technical in nature),[63] (3) whether the inventor chose licensee's counsel,[64] (4) whether it was clear that licensee's counsel was working on behalf of the licensee rather than the inventor[65] (did counsel receive instructions from inventor, whether counsel provided legal advice to inventor), (5) whether licensee's counsel had a fiduciary duty to the inventor, and (6) whether the inventor had a reasonable belief that licensee's counsel was also representing him.

### 1. Whether Licensee and Inventor Were Jointly Prosecuting the Patent Applications

Under the first factor, the Court considers whether SenGupta and Purolite were jointly pursuing the foreign patent applications. If they were, then this would tend to support a finding that

---

[62]*Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 211 (S.D.N.Y. 2009).

[63]*Univ. of W. Va. Bd. of Trs. v. Van Voorhies*, 33 F. Supp. 2d 519, 522 (N.D. W.Va. 1998), *aff'd*, 278 F.3d 1288, 1303-04 (Fed. Cir. 2002).

[64]*Sun Studs, Inc. v. Applied Theory Assocs., Inc.*, 772 F.2d 1557, 1568 (Fed. Cir. 1985).

[65]*Id*.; *Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876, 885 (E.D. Pa. 1976).

Purolite's counsel also represented SenGupta. In *Merck Eprova AG v. ProThera, Inc.*[66] the Southern District of New York granted Merck's motion to disqualify one of the law firms representing the defendant, finding that firm had previously jointly represented Merck and another client, Bayer, in prosecuting patent applications on Merck's product then at issue in the lawsuit. In *Merck Eprova*, although only Bayer engaged and paid the legal fees, the disqualified firm was deemed to have represented both Bayer and Merck, who were co-owners of a patent and who intended to file a joint patent application. In addition, the court found that both Bayer and Merck were clients of the firm "in the traditional sense."[67] The conflict of interest rules therefore precluded the law firm from representing the defendant in the unfair competition action brought by Merck.[68]

The Court generally agrees with the proposition in *Merck Eprova* that, for purposes of disqualification, when two parties are jointly prosecuting a patent application, they should be considered to be jointly represented by the firm prosecuting the applications. The rationale for this is similar to the rationale of the "community of interest" doctrine, which provides that when the same attorney represents the interests of two or more entities on the same matter, those represented are viewed as joint clients for purposes of privilege.[69]

In this case, however, Purolite is not a co-owner of the patent. Nor did Purolite and SenGupta intend or agree to jointly pursue the foreign counterpart patent applications. Instead, the

---

[66]670 F. Supp. 2d 201, 211 (S.D.N.Y. 2009).

[67]*Id.* at 212.

[68]*Id.*

[69]*In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1389 (Fed. Cir. 1996) (citing *Simpson v. Motorists Mut. Ins. Co.*, 494 F.2d 850, 855 (7th Cir. 1974)).

evidence shows that Purolite, authorized by the sublicensing agreement, retained Sullivan and his law firm Darby & Darby to initiate the foreign counterpart applications in Europe, Japan, and Hong Kong. Sullivan and Darby & Darby acted solely at the behest of Purolite. The fact that SenGupta might also benefit from their work does not make him a client. Unlike *Merck Eprova*, SenGupta, the licensor, and Purolite, the sublicensee, were not jointly prosecuting the foreign patent applications so as to establish a joint representation by the attorneys.

### 2. The Nature of Communication and Interactions Between Licensee's Counsel and Inventor

The Court also considers the nature of the communication and interactions between the inventor and counsel for the licensee. The "normal communication of technical information to an assignee's attorney primarily to enable the attorney to prepare and prosecute a patent application"[70] does not create an attorney-client relationship between the inventor and the patent licensee's counsel. If counsel for the licensee obtained from the inventor confidential information that could be used against him and give the licensee an unfair advantage in subsequent litigation, there may arise an attorney-client relationship between the inventor and the counsel.

Where a licensee has been given the right to prosecute further patent applications, counsel for the patent licensee may need to meet, communicate, and even exchange confidential information about the patent with the licensor or inventor. A licensing agreement may even create a contractual obligation for the inventor to provide this information. In *University of West Virginia Board of Trustees v. Van Voorhies*,[71] the court held that the normal exchange of technical information from

---

[70]*Van Voorhies*, 33 F. Supp. 2d at 522.

[71]33 F. Supp. 2d at 522.

an inventor to his licensee's patent counsel, meant primarily to aid the completion of patent applications, does not create an attorney-client relationship between the inventor and the counsel. It found none of the usual indicia of an attorney-client relationship between the inventor and the licensee's counsel.[72] The court further found that the communications between the inventor and the counsel were nothing more than "normal communication of technical information to an assignee's attorney primarily to enable the attorney to prepare and prosecute a patent application."[73]

If the information exchanged is not technical, the Court considers whether it would give the licensee an unfair advantage in subsequent proceedings. Under patent license agreements, it is not unforeseeable that a licensee may end up in litigation with a patentee with whom the licensee has a royalty arrangement.[74] "Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery."[75]

In *Asyst Technologies v. Empak, Inc.*,[76] the plaintiff alleged that the defendant infringed its patents. The defendant argued that both patents were invalid. Two partners at the law firm representing the defendant had, as members of another firm, previously represented the plaintiff in prosecuting the patents. Finding a substantial relationship between the two representations, the court disqualified defense counsel and observed that "[f]ew people are more likely to have confidential

---

[72]*Id.* at 522.

[73]*Id.*

[74]*New York Inst. of Tech. v. Biosound, Inc.*, 658 F. Supp. 759, 762 (S.D.N.Y. 1987).

[75]*Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969).

[76]962 F. Supp. 1241, 1242 (N.D. Cal. 1997).

information with which to attack the validity of a patent than the lawyers who prosecuted it."[77]

Sullivan states in his Declaration that he has never had any conversations with SenGupta concerning the '578 patent, or any foreign counterparts.[78]  Aside from discovery in this action, he has never received any documents from SenGupta or SolmeteX concerning the '578 patent or any foreign counterparts of the '578 patent.[79]  Plaintiffs have not refuted these statements.  Other than the January 2009 conversation between SenGupta and Sullivan, initiated upon the request of SenGupta and not involving the foreign patent applications, there is no evidence of *any* communication or exchange of information between SenGupta and Sullivan.   Accordingly, the Court finds no persuasive evidence to imply an attorney-client relationship on the basis of any interactions and communications between SenGupta and Sullivan.

### 3. *Whether the Inventor Chose Licensee's Counsel*

The Court also considers whether the inventor of the patent chose the attorney or law firm who prosecuted the licensee's patent applications.  In *Sun Studs, Inc. v. Applied Theory Associates,*[80] the Federal Circuit addressed the question of whether an attorney-client relationship existed between an inventor and his assignee's patent attorney, who prosecuted the patent application and for whom the inventor executed a power of attorney.[81]  For the *Sun Studs* court, more important than a power of attorney to prosecute a patent application were (1) the relationship between the inventor and the

---

[77]*Id.*

[78]Sullivan Decl. ¶¶  5-6.

[79]Sullivan Decl. ¶¶ 7-8.

[80]772 F.2d 1557, 1568 (Fed. Cir. 1985).

[81]*Id.*

assignee's patent counsel, and (2) the respective degree of control by the parties in choosing counsel.[82]  If it is the assignee who selects counsel and the inventor's relationship with assignee's counsel concerns only the technical content of the patent application, the assignee, and not the inventor, will be deemed the client.[83]  Although the defendant argued that the challenged firm had acted in the prosecution as an attorney for the inventor and not for the moving party, the Court responded:

> [I]t is routine for an inventor to execute an application appointing the attorneys who prepared the application at the direction of the party to whom the application must be assigned and on whose behalf it will be prosecuted. The choice of attorneys, like the filing, is a decision by the assignee, not the inventor . . .
>
> \*       \*       \*
>
> Should the company later find it necessary to sue on the patent, it is expected that the company would choose its regular patent counsel for representation and whom the inventor designated on its behalf.  Where the former relationship between the inventor and the patent counsel was solely technical in nature, and where the patent counsel in the former relationship was chosen by and at all times was working on behalf of the company rather than the inventor, it should not serve as automatic disqualification that the defendant is the inventor or a company with which he is associated.[84]

Plaintiffs do not argue that SenGupta chose or otherwise exerted any influence over Purolite in choosing Sullivan and the Darby & Darby law firm in prosecuting the foreign patent applications. SenGupta had previously used the services of another law firm, Howson & Howson, to prosecute both his U.S. and his international patent applications.  The Court finds that SenGupta did not choose Purolite's counsel.

---

[82]*Id.* at 1568-69.

[83]*Id.* at 1568.

[84]*Sun Studs*, 772 F.2d at 1568.

### 4. Whether Licensee's Counsel Was Working on Behalf of the Licensee Rather than the Inventor

The Court next considers whether it was clear that Sullivan and Darby & Darby were working on behalf of Purolite, rather than SenGupta. Relevant to this inquiry is whether SenGupta directed the litigation or issued instructions to Sullivan and his law firm on how to proceed in the foreign counterpart applications. Also relevant is whether SenGupta requested, or licensee's counsel provided, legal advice concerning the foreign patent applications.

In *Sun Studs*,[85] the Federal Circuit found no sound basis for the disqualification of plaintiff's counsel. The court found that a power of attorney, executed by the inventor and appointing assignee's patent counsel, does not necessarily create an attorney-client relationship.[86] The court concluded that the relationship between the defendants-inventors and counsel for plaintiff was technical at best and not sufficient to warrant his automatic disqualification. In reaching this conclusion, the court relied on the following: (1) no agreement between inventors and attorney regarding representation; (2) no fee from inventor to attorney; (3) no expectation of confidentiality between the two; (4) the attorney denied being asked to represent the inventors; (5) the inventors knew the attorney represented the company; and, (6) the inventors had previously consulted with their own attorney.[87]

In another case with facts similar to this one, the Federal Circuit affirmed the district court in finding that no attorney-client relationship existed between counsel for the patent assignee and

---

[85] *Id.*

[86] *Id.*

[87] *Id.* at 1567.

the inventor.  In *Telectronics Proprietary, Ltd. v. Medtronics, Inc.*,[88] the court found that the attorneys were not disqualified from representing interests seeking to invalidate the patent, where (1) it had been assigned to an entity who was not a client of the attorneys, (2) proof of invalidity of the patent was limited to prior art that was not known at the time that the application was prosecuted, and (3) there was no showing that attorneys obtained actual confidences that would give their present client unfair advantage.[89]  The bottom line for the court was that "attorneys represent *clients* - not legal positions or patents."[90]

Under the SolmeteX-Purolite Agreement, Purolite had the right and responsibility to prosecute any foreign counterpart patents related to the '578 patent.  Section 4.6 of the SolmeteX-Purolite Agreement provides that "Purolite will be responsible during the Term at its own cost for worldwide patent filings in those countries they deem appropriate following issuance of US patent(s)."  Pursuant to its right to prosecute foreign patent applications, Purolite retained Sullivan and his law firm Darby & Darby to file foreign counterpart patent applications. Whatever role Sullivan and his firm fulfilled with respect to those applications was clearly for the benefit of their client, Purolite, who held the right to pursue them under its licensee agreement with SolmeteX. Purolite directed and controlled the actions of these attorneys to engage foreign lawyers to file foreign counterpart patent applications in Europe, Japan, and Hong Kong.  Purolite paid all the legal fees incurred in connection with those applications.  The records of Darby & Darby identified Purolite as the "client" for all the foreign counterpart patent applications.  The law firm reported any

---

[88]836 F.2d 1332, 1336-37 (Fed. Cir. 1988).

[89]*Id.* at 1336, 1337, and 1339.

[90]*Id.* at 1338 (emphasis in original).

progress concerning them to Purolite only. The evidence before the Court shows that Sullivan and Darby & Darby were working on behalf of Purolite, not SenGupta.

### 5.     *Whether Licensee's Counsel Had a Fiduciary Duty to the Inventor*

The Court also finds that Sullivan and Darby & Darby owed no fiduciary duty to SenGupta as a result of the work performed on the foreign counterpart patent applications for Purolite. While he may have benefitted from the services that Darby & Darby rendered on behalf of its client Purolite, the Court finds no evidence that SenGupta executed a power of attorney or otherwise created a traditional principal-agent or other fiduciary relationship.[91]

### 6.     *Whether the Inventor Had a Reasonable Belief That Licensee's Counsel Was Also Representing Him*

Another factor the Court considers is whether SenGupta reasonably believed that Sullivan or his law firm was also representing him in filing the foreign patent applications. Plaintiffs have not alleged that SenGupta entertained any such belief. Sullivan states in his Declaration that he has never had any conversations with SenGupta concerning the '578 patent, or any foreign counterparts.[92] Aside from discovery in this action, he has never received any documents from SenGupta or SolmeteX concerning the '578 patent or any foreign counterparts of the '578 patent.[93] Plaintiffs have not refuted these statements. Other than the conversation in January 2009 between

---

[91]Even if SenGupta executed a power of attorney granting Sullivan authority to prosecute the foreign counterpart applications, this would not necessarily have created an attorney-client relationship. *See Sun Studs,* 772 F.2d at 1568 (power of attorney granted to a lawyer by an inventor to prosecute a patent application assigned by that inventor to a corporation that retained the lawyer does not by itself create an attorney-client relationship with the inventor).

[92]Sullivan Decl. ¶¶ 5-6.

[93]Sullivan Decl. ¶¶ 7-8.

SenGupta and Sullivan, which did not relate to the foreign patent applications, the Court finds no evidence of any communication between SenGupta and Sullivan. It finds no persuasive evidence that SenGupta ever had a belief, reasonable or otherwise, that Sullivan represented him.

In summary, the Court does not find that an attorney-client relationship should be implied between SenGupta and either Sullivan or his law firm. SenGupta and Purolite were not jointly prosecuting the foreign patent applications. Although SenGupta was named as the applicant on the applications and may have benefitted from the legal services provided by Sullivan to Purolite, those facts by themselves do not imply an attorney-client relationship between SenGupta and Sullivan. The Court finds no evidence of any communication or interactions between SenGupta and Sullivan that relate to the foreign patent applications. SenGupta did not choose Purolite's counsel. The facts show that Sullivan was at all times acting on behalf of Purolite, not SenGupta. Plaintiffs have not shown that SenGupta reasonably believed that Sullivan was also representing him in prosecuting the foreign patent applications. The evidence fails to show that an implied attorney-client relationship was created between SenGupta and Sullivan.

### C. Whether Sullivan and Darby & Darby's Prosecution of the Foreign Patents Is Substantially Related or Materially Adverse to the Present Litigation

If the Court had found an attorney-client relationship between SenGupta and Sullivan, it nevertheless finds that the evidence fails to show that the legal work performed by Sullivan is substantially related to the present litigation. In applying the "substantial relation" test, the court looks to whether the factual contexts of the two representations are substantially similar or related or materially adverse to the present litigation. The general test is whether a substantial relationship exists between the pending suit and the matters in which the attorney is charged to have previously

represented the client.[94]  Matters are "substantially related" for purposes of K.R.P.C. 1.9(a), if they "involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."[95] "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question."[96]

Sullivan states in his Declaration that during the short period of time that Darby & Darby was involved in the prosecution of the foreign counterparts, the work was overwhelmingly ministerial in nature.[97]  He reports one instance of revisions the firm made to claim language to address a formal requirement of Japanese patent law:

> Upon information and belief, during this prosecution, there was one communication from Darby & Darby to Purolite reporting an official action received from a law firm in Japan engaged by Darby & Darby to handle the Japanese counterpart patent application. This communication concerned revisions to certain claim language to address a formal claiming requirement of Japanese patent law. This communication was prepared by an associate attorney at Darby & Darby, and I may have reviewed the letter before it was sent to Purolite.[98]

Sullivan further states that in connection with the foreign counterparts, he did not personally communicate with any foreign patent lawyers, review any prior art, conduct any prior art searches,

---

[94]*Redd v. Shell Oil Co.*, 518 F.2d 311, 315 (10th Cir. 1975).

[95]KRPC 1.9(a), cmt. 3.

[96]Model Rules of Prof'l Conduct R. 1.9 cmt. 2.

[97]*Id.*

[98]Sullivan Decl. ¶ 11.

perform any legal analyses, prepare any responses or arguments in support of patentability, or otherwise significantly participate in the substance of any work concerning the foreign counterparts, although he was copied on at least some correspondence. He further states that the foreign counterpart patent work was performed by associate lawyers and patent agents at Darby & Darby.

The Darby & Darby correspondence supports Sullivan's assertion that he was minimally involved with the foreign patent applications. None of the letters from Darby & Darby to Purolite or to foreign counsel were signed by Sullivan, although he was copied on them. From the correspondence submitted, it appears that others at the Darby & Darby firm, namely Marie Collazo and Flynn Barrison, actively prosecuted the foreign counterpart applications. The Court has no reason to doubt Sullivan's statement that he did not personally communicate with any foreign patent lawyers, review any prior art, conduct any prior art searches, perform any legal analyses, prepare any responses or arguments in support of patentability, or otherwise significantly participate in the substance of any work concerning the foreign counterparts. The Court cannot say that Sullivan was so involved in the prosecution of the foreign patent applications that his subsequent representation of Purolite in this action can be justly regarded as a changing of sides in the matter in question. Any involvement by Sullivan in the prosecution of the foreign patent applications for his client Purolite does not appear to be substantially related to the present litigation and particularly to the issue of the validity or invalidity of the U. S. '578 patent.

The Court further finds no fatal inconsistency between the legal services provided to Purolite by Darby & Darby in pursuing the foreign patent registrations and the defense of invalidity of the U. S. patent it asserts in this case. Darby & Darby represented Purolite in its foreign counterpart applications for the '578 patent in Europe, Japan, and Hong Kong. Those applications of course

identified SenGupta's '578 patent for the purpose of registration. And they assumed the validity of the patent, without litigating it. The Court finds nothing in the evidence to suggest that the applications for foreign registrations engaged Sullivan or his firm to prosecute or prove the validity of the underlying U. S. '578 patent. The evidence simply fails to show that, by asserting the defense of invalidity of the patent, they are now taking a position materially adverse to their pursuit of foreign registrations or that the defense of invalidity and those applications are so substantially related as to require disqualification of counsel in this case.

### D. Whether Disqualification of Sullivan and His Current Law Firm Is Appropriate

Assuming *arguendo* that an attorney-client relationship existed between SenGupta and Sullivan and that the work of his former law firm on the foreign patent applications is substantially related to the present action under KRPC 1.9(a), such a conflict does not automatically require disqualification of Sullivan and his current law firm from representing Purolite. The Court must first be certain that this blunt remedy serves the purposes behind KRPC 1.9.[99] A motion to disqualify counsel deserves serious, conscientious, and conservative treatment.[100] "Because the interests to be protected are critical to the judicial system, doubts are resolved in favor of disqualification."[101]

The Court balances several competing considerations in order to determine whether disqualification is appropriate in the particular circumstances of the case. These factors include: "(1) the nature of the ethical violation, (2) the prejudice to the parties, including the extent of actual or

---

[99]*Koch v. Koch Indus.*, 798 F. Supp. 1525, 1531 (D. Kan. 1992).

[100]*Id.* at 1530.

[101]*Id.* at 1531 (citation omitted).

29

potential delay in the proceedings, (3) the effectiveness of counsel in light of the violations, and (4) the public's perception of the profession."[102] In addition, "disqualification is only appropriate where the offending attorney's conduct threatens to 'taint the underlying trial' with a serious ethical violation."[103]

### 1.    *Nature of the Ethical Violation*

The Court has concluded that there is no ethical violation. But assuming *arguendo* an ethical violation exists, the very limited amount of contact and communication between SenGutpa and Sullivan, as well as his limited role in the firm's work in prosecuting the foreign patent applications, minimizes the risk that he has gained confidential factual information detrimental and materially adverse to SenGupta in this case. Sullivan has declared that he has never had any conversations with SenGupta concerning the '578 patent, or any foreign counterparts.[104] Nor has he ever received any documents from SenGupta or SolmeteX concerning the '578 patent or its foreign counterparts, aside from discovery in this litigation.[105] This factor weighs against disqualification.

### 2.    *Prejudice to the Parties*

The prejudice to the parties weighs in favor of allowing Purolite to keep its counsel of choice. Sullivan has represented Purolite since 2005. During that time he has represented Purolite

---

[102]*Barragree v. Tri-County Elec. Co-op, Inc.*, 263 Kan. 446, 458, 950 P.2d 1351, 1359 (1997) (citations and quotations omitted).

[103]*Hjersted Family Ltd. P'ship v. Hallauer*, No. 06-2229-CM-GLR, 2007 WL 2789829, at *3 (D. Kan. Sept. 21, 2007) (citations omitted).

[104]Sullivan Decl. ¶¶ 5-6.

[105]Sullivan Decl. ¶¶ 7-8.

in multiple intellectual property matters, including patent prosecution, patent litigation, trademark prosecution, and trademark litigation. In the course of this representation he has become familiar with the products and processes of Purolite, including those that are the subject of this litigation. As its primary contact at both the Darby & Darby and Fish & Richardson law firms, he has built relationships with its personnel. He has gained familiarity with its business operations as they relate to intellectual property matters. Given his prior representation of Purolite and knowledge acquired during that representation, along with the work performed thus far in the case, his disqualification, unless justified by the facts, would be prejudicial and unjust to Purolite.

The Court finds less prejudice to Plaintiffs, if any, if Sullivan remains as counsel for Purolite. Plaintiffs have not shown that his continued representation will put them at substantial risk for the disclosure of adverse confidential information. His Declaration denies any conversations with SenGupta or receipt of documents from him or SolmeteX as to the '578 patent or any of its foreign counterparts.[106] Plaintiffs have neither refuted that statement nor otherwise shown that Sullivan received confidential material about the '578 patent or any foreign counterparts from SenGupta. This factor weighs against disqualifying defense counsel.

### 3.    *Effectiveness of Counsel*

If Sullivan and his current law firm are disqualified from representing Purolite in this action, the effectiveness of Purolite's remaining counsel may be significantly diminished. He has represented Purolite since 2005 and was admitted early in this case. He apparently is familiar with the products and processes of Purolite, as well as with the issues in this litigation. This factor

---

[106]Sullivan Decl. ¶¶ 5-8.

weighs against disqualification.

### 4. *Public's Perception*

The Court recognizes a risk of negative public perception, if Sullivan and members of his current law firm continue to represent Purolite in this case. Failure to analyze the facts can lead one to assume indeed that they have pursued materially inconsistent positions with regard to the '578 patent. The technology of the patent remains the same, whether it is the subject of applications for foreign registration or of litigation as to its validity under U.S. patent law. This can easily lead one to believe that to deny validity is materially inconsistent with applying for foreign registrations, which assume validity. Much of Plaintiff's argument rests upon that assumption, although the Court has found that the facts before it fail to substantiate a material inconsistency. The concern for public perception is a factor that favors disqualification of Sullivan.

### 5. *Threat of Representation Tainting this Case*

Another factor is whether the offending attorney's conduct threatens to taint the underlying trial with a serious ethical violation.[107] The court should disqualify opposing counsel if the continued representation would threaten the integrity of the adversarial process.[108] The risk of taint is encountered when an attorney might benefit a current client by using confidential information about a former client, obtained through prior representation of that client.[109] The Court does not

---

[107]*Mike v. Dymon, Inc.,* Civ. A. No. 95-2405-EEO, 1996 WL 427761, at *4 (D. Kan. July 25, 1996).

[108]*Id.*

[109]*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 438 F. Supp. 2d 305, 307-8 (S.D.N.Y. 2006).

find that Sullivan ever represented SenGupta or received any confidential information from SenGupta that would give Purolite an unfair advantage and taint the integrity of adversarial process. The Court finds that the continued representation of Purolite by Sullivan and his current law firm does not taint this case. This factor weighs against disqualification.

Under the particular facts and circumstances of this case, the Court concludes that the blunt, disfavored remedy of disqualification of Sullivan and his current law firm, Fish & Richardson, from representing Purolite in this action is not appropriate.

## V.     Whether Plaintiffs' Motion to Disqualify Was Unreasonably Delayed

Merits of the motion aside, the Court finds that it should be denied for unjustifiable and undue delay of its filing. An unjustified delay in filing a motion to disqualify is sufficient grounds for denying the request.[110] "A litigant may not delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of the case has been completed."[111] Factors a court should consider in determining whether the moving party has waived its right to object to the opposing party's counsel include: (1) the length of the delay in bringing a motion to disqualify, (2) when the movant learned of the conflict, (3) whether the movant was represented by counsel during the delay, (4) why the delay occurred, (5) whether disqualification would result in prejudice to the nonmoving party, and (6) whether the

---

[110]*See Redd v. Shell Oil Co.*, 518 F.2d 311, 315 (10th Cir. 1975) ("eleventh hour" filing of motion to disqualify counsel on Friday preceding Monday trial date fully justified the trial court's summary rejection of the motion).

[111]*Coffeyville Res. Ref. & Mktg. v. Liberty Surplus Ins. Corp.*, 261 F.R.D. 586, 589-91 (D. Kan. 2009); *Monarch Normandy Square Partners v. Normandy Square Assocs. Ltd. P'ship*, Nos. 88-1338-C, 88-1513-C, 1989 WL 86963, at *3 (D. Kan. July 26, 1989).

motion was delayed for tactical reasons.[112]

In *Coffeyville Resources Refining and Marketing v. Liberty Surplus Insurance Corp.*,[113] the court denied a motion to disqualify counsel as unjustifiably delayed. It found that a delay of six months between the *pro hac vice* admission of the attorneys and the filing of the motion to disqualify them to be fatal to the motion. The court noted that the moving party waited until motions for partial summary judgment were fully briefed and discovery completed before moving to disqualify counsel.[114] The court found this delay to be inexcusable and unjustifiable, as well as unfairly prejudicial.[115] In addition to the *Coffeyville* case, Purolite has cited four cases from other districts wherein the court denied motions to disqualify counsel because of unjustifiable delays in filing them.[116]

The Court concludes that Plaintiffs unjustifiably delayed their motion to disqualify Purolite's counsel. They waited until a year after Sullivan was admitted *pro hac vice* in this action and nine months after SenGupta was joined as a plaintiff. Based upon their own present contentions, Plaintiffs should have been aware of any potential conflict at least from the time of the joinder.

---

[112]*Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F. Supp. 1200, 1208 (E.D. Pa. 1992).

[113]261 F.R.D. at 589-91.

[114]*Id.* at 591.

[115]*Id.*

[116]*In re Metoprolol Succinate Patent Litig.*, No. 403-592-RWS, 2005 WL 1661509, at *4 (E.D. Mo. July 8, 2005) (thirteen month delay in filing motion to disqualify held unreasonable); *In re Rite Aid Corp. Sec. Litig.*, 139 F. Supp. 2d 649, 661 (E.D. Pa. 2001) (nine month delay held unreasonable); *Hayes v. Cent. States Orthopedic Specialists, Inc.*, 51 P.3d 562, 569 (Okla. 2002) (eight month delay precluded the "harsh remedy" of disqualification); *Batchelor v. Batchelor*, 213 Wis. 2d 251, 570 N.W. 2d 568 (Wis. App. 1997) (three month delay held unreasonable).

Even before this action was filed, moreover, counsel for Plaintiff Layne was aware of the work Sullivan and his firm Darby & Darby had performed with regard to the European, Japanese, and Hong Kong foreign patent applications. On July 15, 2009, Sullivan shipped his law firm's files to the law offices of Layne's counsel. They consisted of Darby & Darby's files of "Purolite International, Ltd. For [SenGupta]" pertaining to the European, Japanese, and Hong Kong patent applications.[117]

Plaintiffs deny any unjustified delay in filing their motion. They assert that they filed it as soon as a disabling conflict of interest became apparent. They argue that, although Sullivan sought admission to this case on August 28, 2009, the disabling conflict did not arise until Purolite filed its Second Amended Answer and Counterclaim on September 15, 2010, asserting invalidity of the '578 patent. Plaintiffs filed their motion two weeks later. They say they could not have waived their right to move for disqualification, inasmuch as existence of a conflict had not yet become manifest. They argue that, even if the Court considers the delay to be thirteen months, it is not unjustified. Although the case has been pending for over a year, little progress has been made toward a resolution on the merits. Plaintiffs admit that the parties have produced documents, but they point out that no case deadline of any significance has passed. Fact discovery is not set to close until June 10, 2011, with expert reports more than a month later, and trial a year away.

The Court is not persuaded by the argument that a disabling conflict did not arise until Purolite filed it Second Amended Answer and Counterclaim. In its Answer to Amended Complaint (ECF No. 23), filed January 7, 2010, Purolite denied Layne's allegations that the '578 patent was

---

[117]Ex. I to Pls.' Suggestions in Supp. of Mot. to Disqualify (ECF No. 116-9).

duly issued and is in full force and effect.  That denial should have alerted Layne that Purolite was denying the validity of the '578 patent.

The Court further finds that disqualification would result in prejudice to the nonmoving party. This case has been on file since July 2009.  Since then the parties have exchanged written discovery, including voluminous document production, conducted a Rule 30(b)(6) deposition, and filed a number of contested motions.   A substantial amount of preparation occurred before this motion.  The delay of nine months after SenGupta was joined as a plaintiff is unfairly prejudicial to Purolite.  Considering all these factors, the Court finds that Plaintiffs' Motion to Disqualify should be denied as unreasonably delayed.

## VI.     Defendant Purolite's Request for Sanctions

Purolite asks the Court to consider monetary sanctions against Plaintiffs in an amount at least for its costs in opposing the motion, because the motion is not substantially justified.  It argues that public policy demands that parties be discouraged from filing frivolous motions for disqualification, particularly when the record suggests they are made for strategic reasons.

The Court finds that sanctions against Plaintiffs for filing the motion to disqualify are not warranted.  Although denying the motion, the Court does not find it frivolous.  Plaintiffs raised legitimate issues with regard to Sullivan and his former law firm and their work in prosecuting the foreign counterpart patent applications.  For the reasons already discussed, the Court does not find that Sullivan or his current law firm should be disqualified from representing Purolite in this case. The Court does not find, however, that Plaintiffs filed the motion for improper purpose or that they lacked any reasonable grounds for filing it.  Accordingly, it denies the request for sanctions.

**IT IS THEREFORE ORDERED THAT** Plaintiffs' Motion to Disqualify Counsel (ECF

No. 115) is denied, as set forth herein.

**IT IS FURTHER ORDERED THAT** Defendant's request for sanctions is denied.

Dated in Kansas City, Kansas on this 24th day of March, 2011.


S/ Gerald L. Rushfelt
Gerald L. Rushfelt
United States Magistrate Judge